[No. A108619. First Dist., Div. Two. June 13, 2006.]

JAMES PERRY, Plaintiff and Appellant, v.
EAST BAY REGIONAL PARK DISTRICT et al., Defendants and
Respondents.

CYNTHIA PERRY, Plaintiff and Appellant, v.
EAST BAY REGIONAL PARK DISTRICT et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976 and 976.1, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports, with the exception of: (1) part B.2.a., and footnotes 9 and 10 (p. 11); and (2) part B.2.c., and footnotes 13 and 14 (p. 14). However, the final paragraph in part B.2.c., on page 14, commencing with "In conclusion . . . ," should be included in the published portion of the opinion.

## COUNSEL

Law Offices of Waukeen Q. McCoy and Waukeen Quandrico McCoy for Plaintiff and Appellant James Perry.

Law Offices of Albert G. Stoll, Jr., and Albert Gustav Stoll, Jr., for Plaintiff and Appellant Cynthia Perry.

Reed Smith, Paul D. Fogel, J. David Bickham, Denise M. Howell, Ruth L. Robinson; East Bay Regional Park District Counsel and Ted C. Radosevich for Defendants and Respondents.

## OPINION

**KLINE, P. J.**—James Perry, an individual and on behalf of the estate of Jason Perry (James Perry), and Cynthia Perry (collectively plaintiffs), appeal after the trial court granted the motion for summary judgment brought by the East Bay Regional Park District (Park District), Jenny O'Shea, and Mark Pearson (collectively defendants), in this consolidated action for negligence and wrongful death, arising from the drowning death of Jason Perry, the 14-year-old son of James Perry and Cynthia Perry. On appeal, plaintiffs contend the court erred when it found defendants were immune from liability, pursuant to Government Code section 831.7,[1] and granted defendants' motion for summary judgment. We shall affirm the judgment.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

## PROCEDURAL BACKGROUND

On January 15, 2003, James Perry filed a first amended complaint against defendants, alleging negligence and wrongful death and, on October 22, 2003, Cynthia Perry filed a first amended complaint against defendants, also alleging negligence and wrongful death.[2]

On or about May 28, 2004, defendants moved for summary judgment, claiming government immunity pursuant to sections 831.7, 831.2, and 831.21.

On August 20, 2004, the trial court granted defendants' summary judgment motion, on the ground that defendants were immune from liability, pursuant to section 831.7.[3] On October 6, 2004, the trial court entered judgment. On October 7, 2004, defendants served notice of entry of the judgment.

On October 28, 2004, Cynthia Perry filed an untimely notice of intention to move for a new trial.

On November 18, 2004, James Perry filed a notice of appeal. On November 29, 2004, Cynthia Perry filed a notice of appeal.[4]

## FACTUAL BACKGROUND

### I. History and Description of Lake Temescal Generally

Temescal Regional Recreational Area is located in Oakland, California. The lake on the property, Lake Temescal, was formed when a dam was constructed on Temescal Creek in the 1860's, and originally served to store drinking water for the City of Oakland. The property was purchased by the Park District, a public agency, in the 1930's. The lake has a public beach and

---

[2] James Perry and Cynthia Perry are divorced; they each filed a lawsuit in this matter, and the cases were consolidated in the trial court; they filed separate notices of appeal in this court under case No. A108619.

[3] In their summary judgment motion, defendants also argued they were immune from liability based on sections 831.2 and 831.21 (natural condition immunity). The trial court found there were disputed issues of material fact regarding the claim of natural condition immunity and regarding whether defendants were liable under section 835 (liability for a dangerous condition), precluding summary judgment on those grounds.

[4] On December 9, 2004, the trial court stayed the matter of Cynthia Perry's new trial motion, citing Code of Civil Procedure section 916 and noting the filing of the notices of appeal. Respondent observes that while section 916 of the Code of Civil Procedure did not deprive the trial court of jurisdiction to hear the new trial motion (see *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 191 [25 Cal.Rptr.3d 298, 106 P.3d 958]), the untimeliness of the motion *did* deprive the trial court of such jurisdiction (see Code Civ. Proc., § 659.)

swimming area. In 1964, the Park District undertook a project to reshape the lake's beach and swimming area, to accommodate more visitors. Sand and dirt were added to the existing swimming area and, upon completion of the project, the swimming area gradually sloped away from the shore of the lake (with a ten-to-one ratio) to a depth of approximately five feet, after which it sloped more steeply (with a three-to-one ratio). Due to the accumulation of silt on the lake bottom, parts of the lake are dredged periodically to remove the silt. At its deepest, the lake is approximately 20 feet deep.

During swim season, which runs from April to October, the lake's swimming area is demarcated by floating lines and buoys. The lines and buoys divide the swimming area into a wading area, a general swim/play area, and a lap lane. The drop-off—where the depth of the water increases sharply—is located primarily within the lap lane. Two signs are posted on the beach to warn of the increase in depth. They depict a person slipping off a ledge in the water, and state, "WARNING—DROP-OFF."

During swim season, the lake's public beach is open and lifeguards are on duty from 11:00 a.m. to 6:00 p.m. When lifeguards are on duty, the Park District charges a fee to enter the beach and swim area. The fee is collected at a kiosk at the entrance to the lake between the hours of 11:00 a.m. and approximately 6:00 p.m.[5] A sign posted at the kiosk states dates and hours when lifeguards are present.

The two signs that warn of the drop-off also state, "NO LIFEGUARD ON DUTY—CHILDREN SHOULD NOT SWIM OR WADE WITHOUT ADULT IN ATTENDANCE." When lifeguards are on duty, this part of the sign is covered with another sign stating the beach rules and also stating that a lifeguard is on duty.

## II. *Events Leading to the Drowning Death of Jason Perry*

On Saturday, June 15, 2002, Jason's father, James Perry, got married. He asked his new stepdaughter, Danielle Jeter (Danielle), to watch Jason because James Perry and Danielle's mother were leaving on their honeymoon. On Sunday, June 16, 2002, about 3:00 p.m., Danielle and her friend, Allen Adams (Allen), took Jason and Danielle's 12-year-old brother, Darren Jeter (Darren), to the Temescal Regional Recreational Area to fish and attend a birthday party.

After fishing for about two hours, Jason and Darren went with some other children to the beach sometime between 5:00 p.m. and 6:00 p.m. Danielle

---

[5] The kiosk might close earlier than 6:00 p.m. if there are few people coming to the lake.

remained at a picnic site in the park, although she checked on the boys every 15 to 20 minutes. At one point, Allen went to the beach to check on the two boys and they told him the lifeguard would not allow them in the water wearing only their boxer shorts. The boys returned to the picnic site and asked Danielle if they could swim. She was hesitant, but ultimately agreed.

There were four lifeguards on duty at Lake Temescal on Sunday, June 16, 2002. Jennifer O'Shea was the head lifeguard on duty that day. She had been trained in rescue techniques, CPR, and first aid. At approximately 5:30 p.m., one lifeguard went off duty and O'Shea gave a standard warning that the lifeguards would go off duty at 6:00 p.m. She used a voice gun, which is louder than a megaphone, and made the following announcement three times, once toward the right side of the beach, once toward the left side of the beach, and once toward the water: "May I have your attention, please? In approximately—this is the half-hour call. In approximately 30 minutes, Lake Temescal lifeguards will be going off duty. At that time, the bathroom and shower facility will be closed and you'll be swimming at your own risk. Parents, please watch your children and have a great evening. Good night."

At 6:00 p.m., there were enough people still in the water that O'Shea did not feel comfortable about having the lifeguards go off duty. At 6:15 p.m., she decided that enough people were out of the water that she could make the 15-minute announcement and close at 6:30 p.m. Therefore, at 6:15 p.m., she made another announcement, again repeating it three times, that the lifeguards would go off duty at 6:30 p.m. At that point, people started leaving the water and going to the bathrooms.

At 6:30 p.m., O'Shea decided to make the closing announcement because there were significantly fewer people in the water and on the beach.[6] She announced three times through the voice gun, once toward each side of the beach and once toward the water: "May I have your attention, please . . . . It's 6:30. The Lake Temescal lifeguards are now going off duty. The bathroom and shower facility will be locked shortly. You are now swimming at your own risk. Parents, please watch your children and have a great evening." The lifeguards then took down the two signs that covered up the statement, "No lifeguard on duty," locked the bathrooms, and went into the lifeguard station. The other two lifeguards left the station about 6:45 p.m.

After doing some paperwork, O'Shea took a shower. She then changed into her street clothes and called her parents to let them know she would meet them at a restaurant. Then, about 7:00 p.m., there was a knock on the

---

[6] O'Shea had discretion to determine when to shut down the beach. At some Park District lakes, lifeguards stay until the last person leaves. Others shut down when the sun goes down; others go by the number of people or types of swimmers that are present.

lifeguard station door. O'Shea opened the door, and saw a little girl standing there. The girl said a boy had gone under the water and had not come back up. O'Shea asked the girl if she was serious, and the girl said, "yes." O'Shea told the girl to wait right there and O'Shea ran to her locker and changed into her swimsuit bottoms. She grabbed a radio, which she used to contact the park's emergency control dispatch to obtain permission to enter the water without another lifeguard present and to request help. At the same time, she ran with the girl toward the beach. When they got to the beach, O'Shea was talking on the radio and asking people for "a last seen point" for the victim. A woman tried to push her toward the water saying, "Get in the water. Get in the water." O'Shea backed away and told the woman she would go in when she found a last seen point and when dispatch told her she could.

About 30 seconds later, O'Shea received clearance to enter the water. She learned from people on the beach approximately where the last seen point of the victim was, near where some people were diving. She then handed the radio to the woman who had been pushing her, told the woman to tell dispatch what was happening, ran into the water, swam to where the divers were, and organized them into a pattern dive—shoulder-to-shoulder, perpendicular to the beach—to search for the victim. The nearest diver was stationed right where the drop-off began, because, according to O'Shea, "[m]ost of the rescues we have occur right along that drop-off when people think they can stand and then can't anymore. So that's where most of them occur. So I wanted to make sure if the victim was along the drop-off, that we didn't miss him."

The first dive did not work very well, so O'Shea had the divers swim back to the original starting point, and do it again. They found nothing on the second dive, so they dove again; a man found Jason on the third or fourth dive. The man brought him up, and O'Shea swam him into shore. It took about three minutes from the time O'Shea entered the water to when she brought Jason into shore. Once on the beach, O'Shea checked Jason for breathing and pulse and observed neither. She then attempted rescue breathing, but his airway was obstructed. Park District Police Officer David Dubowy, and Park District Ranger Mark Pearson arrived, and Pearson took over the CPR efforts while O'Shea went to the station to get medical equipment stored there. Using CPR and the medical equipment, O'Shea and Pearson, with assistance from the officer, attempted to clear Jason's airway and resuscitate him.

After paramedics arrived, they took over the CPR and put Jason in an ambulance. He was transported to Oakland Children's Hospital, where he was pronounced dead at 7:57 p.m.

## DISCUSSION

Plaintiffs contend the trial court erred when it found defendants were immune from liability, pursuant to section 831.7, and granted defendants' motion for summary judgment on that basis. According to plaintiffs, defendants were not immune from liability because exceptions to section 831.7's hazardous recreational activity immunity applied. (See § 831.7, subd. (c)(1) [failure to guard or warn of a known dangerous condition], (2) [payment of a specific fee] & (5) [gross negligence].)[7]

### I. Standard for Summary Judgment and Standard of Review

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment has the initial burden of showing either that one or more elements of the cause of action cannot be established or that there is a complete defense. (§ 437c, subd. (p)(2).) If that initial burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (§ 437c, subd. (p)(2); see Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 850–853 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

We review a summary judgment ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (Marie Y. v. General Star Indemnity Co (2003) 110 Cal.App.4th 928, 949 [2 Cal.Rptr.3d 135].)

### II. Immunity Under Section 831.7

The legislation that ultimately was enacted as section 831.7 (Assem. Bill No. 555 (1983–1984 Reg. Sess.)) "sought to give a public entity and its employees specific qualified immunity from liability for injuries due to defined 'hazardous recreational activity' on public property. The source of the bill was the Oakland East Bay Regional Park District; it received support from numerous park and recreation districts, municipalities and counties. These public entities desired to keep their land open to recreational users but sought some protection against increasing numbers of personal injury actions

---

[7] Plaintiffs have also discussed the applicability of sections 831.2, 831.21, and 835, regarding which the trial court found triable issues of material fact, in their opening briefs. Defendants, however, have stated in their respondents' brief that they "do not challenge these rulings in this appeal because the judgment is independently supported by hazardous recreational activity immunity."

by public property users engaging in such activities as hang gliding and rock climbing, and attendant escalating insurance rates." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 223–224 [38 Cal.Rptr.2d 35] (*Iverson*).)

Section 831.7 provides in relevant part: "(a) Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person who assists the participant, or to any spectator who knew or reasonably should have known that the hazardous recreational activity created a substantial risk of injury to himself or herself and was voluntarily in the place of risk, or having the ability to do so failed to leave, for any damage or injury to property or persons arising out of that hazardous recreational activity.

"(b) As used in this section, 'hazardous recreational activity' means a recreational activity conducted on property of a public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator.

" 'Hazardous recreational activity' also means:

"(1) Water contact activities, except diving, in places where or at a time when lifeguards are not provided and reasonable warning thereof has been given or the injured party should reasonably have known that there was no lifeguard provided at the time. [¶] . . . [¶]

"(c) Notwithstanding the provisions of subdivision (a), this section does not limit liability which would otherwise exist for any of the following:

"(1) Failure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose."

"(2) Damage or injury suffered in any case where permission to participate in the hazardous recreational activity was granted for a specific fee. For the purpose of this paragraph, a 'specific fee' does not include a fee or consideration charged for a general purpose such as a general park admission charge, a vehicle entry or parking fee, or an administrative or group use application or permit fee, as distinguished from a specific fee charged for participation in the specific hazardous recreational activity out of which the damage or injury arose. [¶] . . . [¶]

"(5) An act of gross negligence by a public entity or a public employee which is the proximate cause of the injury.

"Nothing in this subdivision creates a duty of care or basis of liability for personal injury or for damage to personal property." (§ 831.7.)

### A. *Trial Court Background*

The trial court granted defendants' summary judgment motion on the ground that defendants were immune from liability for all causes of action, pursuant to section 831.7. In particular, the court found Jason was indisputably engaged in a hazardous activity, i.e., swimming at a time and place where no lifeguards were provided and reasonable warning had been given, pursuant to section 831.7, subdivision (b)(1).

The court found inapplicable the exception in subdivision (c)(2) of section 831.7, because there was no evidence from which a trier of fact could conclude the swim fee was charged at times other than when lifeguards were on duty and, therefore, the fee was not charged for the hazardous activity at issue. The court also found inapplicable the exception in subdivision (c)(5) of section 831.7, finding as a matter of law that plaintiffs' evidence regarding lifeguard O'Shea's conduct did not rise to the level of gross negligence.[8]

### B. *Legal Analysis*

#### 1. *Immunity Under Section 831.7, Subdivision (a)*

Under section 831.7, public entities and employees are not liable to "any person who participates in a hazardous recreational activity" for any injury arising out of that hazardous recreational activity. (§ 831.7, subd. (a).) A "hazardous recreational activity" is generally defined in section 831.7, subdivision (b), as "a recreational activity conducted on property of a public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator." The statute then defines specific hazardous recreational activities, including "[w]ater contact activities, except diving, in places where or at a time when lifeguards are not provided and reasonable warning thereof has been given or the injured party should reasonably have known that there was no lifeguard provided at the time." (§ 831.7, subd. (b)(1).)

In the present case, we agree with the trial court that there is no triable issue regarding whether Jason was swimming at a time and place when

---

[8] The trial court did not address the "failure to guard or warn" exception of section 831.7, subdivision (c)(1), for the reasons explained in an unpublished portion of this opinion.

lifeguards were not provided, whether warnings were given that the life-guards were off duty, and whether Jason should reasonably have known that there was no lifeguard on duty at the time. (§ 831.7, subd. (b)(1).) Thus, the activity in which Jason was engaged was, "by definition," a hazardous recreational activity. Indeed, plaintiffs have not challenged this finding by the trial court.

## 2. *Exceptions to Immunity Under Section 831.7, Subdivision (c)*

Section 831.7 also contains certain exceptions to the immunity for injuries arising from hazardous recreational activities, including, inter alia, failure to guard or warn of a known dangerous condition (§ 831.7, subd. (c)(1)); injury where permission to participate in the hazardous recreational activity was granted for a specific fee (§ 831.7, subd. (c)(2)); and an act of gross negligence by a public entity or a public employee that is the proximate cause of the injury (§ 831.7, subd. (c)(5)).

Plaintiffs contend there are triable issues of material fact regarding the applicability of each of these three exceptions, which require reversal of the trial court's grant of summary judgment. We shall address each exception in turn.

### a. *Failure to Guard or Warn of a Known Dangerous Condition**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### b. *Permission to Participate Was Granted for a Specific Fee*

Both plaintiffs contend the exception to immunity found in section 831.7, subdivision (c)(2), for charge of a specific fee, applies here, precluding the immunity otherwise provided by section 831.7 for participation in a hazardous recreational activity.

The relevant evidence in the record on this issue includes the following deposition testimony of Park District Ranger Mark Pearson:

"Q. Is there an admission charge required for people to use the swim area at Lake Temescal?

---

*See footnote, *ante*, page 1.

"A. Yes, sir, when the lifeguards are on duty."

In addition, a brochure published by the Park District states: "SWIMMING is permitted only in the designated area. Dogs are not allowed in the lake. Lifeguards are on duty from 11 a.m. to 6 p.m. seven days a week during swim season (April–October). Swimming is also allowed at your own risk when lifeguards are not on duty when the park is open. There is a swim fee. Call the park office at (510) 652-1155 for details, or see www.ebparks.org. An accessible beachhouse adjacent to the swim area offers changing rooms and showers." The park map included in the Park District brochure contains a text box that states: "*There is a fee* for fishing, parking (weekends, holidays, or when entry kiosk is staffed) and *for swimming when lifeguards are on duty.*" (Italics added.)

Finally, the Park District's Web site lists various "Swim Facilities" in the Park District and provides information regarding swim fees, lifeguard service dates, and swimming hours. The listing under the heading, "LAKE TEMESCAL," states:

"Temescal Regional Recreation Area

"6502 Broadway Terrace

"Oakland, CA 94610

"(510) 652-1155

"Swim fee: $3 age 16–61; $2 age 1–15; seniors (62+yrs) and

"disabled; under 1 year free

"Lifeguard hours:

"—Weekends—April 11–May 23, 11 a.m.–6 p.m.

"—Daily—May 29–September 6, 11 a.m.–6p.m.

"—Weekends—September 11–October 10, 11 a.m.–6 p.m.

"CLOSED NOV 1–MARCH 15, 2005"

Plaintiffs argue that the information in the Park District brochure and the Web site, stating there is a swim fee without specifying that the fee is only charged when lifeguards are on duty, creates a triable issue of fact regarding

whether the swim fee is charged only when lifeguards are on duty. On the contrary, these statements merely provide general information about Lake Temescal, without in any way contradicting the more detailed statement contained in the park map—which is part of the Park District brochure—or Pearson's testimony that the swim fee is only charged when lifeguards are on duty.

Accordingly, we agree with the trial court's finding that there is "no evidence from which a trier of fact could conclude that the swim fee is charged at times other than when lifeguards are on duty."

The next question the trial court addressed was whether the swim fee exception found in subdivision (c)(2) of section 831.7 applies to these facts, i.e., whether a fee charged only for swimming with a lifeguard present would carry over to swimming without a lifeguard. The court observed that this exception applies only where a "specific fee" is charged for "participation in the specific hazardous recreational activity out of which the damage or injury arose." (§ 831.7, subd. (c)(2).) It then reasoned that "[t]he statute defines the specific hazardous activity here to be swimming without a lifeguard, not swimming generally. Here, the specific fee is therefore not charged for the specific hazardous activity at issue."

■ We agree with the trial court that the language of the statute makes plain that, for the exception to be applicable here, we would have to find that the Park District charged Jason a specific fee to swim without a lifeguard present, a fact belied by the evidence in the record.[11] ■ Hence, a simple reading of the statute demonstrates that section 831.7, subdivision (c)(2)'s swim fee exception does not apply in the circumstances of this case. (See *Iverson, supra*, 32 Cal.App.4th at p. 223 [in ascertaining intent of lawmakers in enacting legislation, court looks first to words of a statute].)[12]

---

[11] Defendants also assert, in support of the grant of summary judgment on this ground, that there is no evidence that Jason actually paid a swim fee. Having found that section 831.7, subdivision (c)(2) is inapplicable to the present case because the fee is not charged for the specific hazardous recreational activity of swimming without a lifeguard, we need not reach the question whether a party must show actual payment of the swim fee to establish the "swim fee" exception.

[12] To conclude otherwise would not only contradict the language of the statute, but would also be inconsistent with the purpose of section 831.7 (see *Iverson, supra*, 32 Cal.App.4th at p. 224), and the general purpose of the Tort Claims Act, of which section 831.7 is a part: to " 'confine potential governmental liability to rigidly delineated circumstances: immunity is waived only if the various requirements of the act are satisfied.' [Citation.]" (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [15 Cal.Rptr.2d 679, 843 P.2d 624]; see also *Perez v. City of Los Angeles* (1994) 27 Cal.App.4th 1380, 1388 [33 Cal.Rptr.2d 55] ["If the Legislature had not intended to shield public entities from liability claims arising from hazardous recreational activities, granting only limited rights to sue in certain narrow circumstances, public entities would no doubt severely restrict the access to and use of public lands.

c. *Gross Negligence by a Public Employee*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In conclusion, while we appreciate the heartbreaking nature of this case, because section 831.7 provides the Park District with complete immunity from liability, the trial court properly granted summary judgment on that ground.

## DISPOSITION

The judgment is affirmed. Costs on appeal are forwarded to defendants.

Lambden, J., and Busch, J.,[†] concurred.

The petition of all appellants for review by the Supreme Court was denied September, 13, 2006, S145268.

---

[Citations.] The broad legislative grant of immunity to public entities is an appropriate price to pay for the extensive and enjoyable, though often inherently hazardous, recreational use of the myriad of so readily accessible public lands"].)

[*]See footnote, *ante*, page 1.

[†]*Judge of the Superior Court of San Francisco County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*