Filed 6/28/17  Certified for Partial Pub. 7/26/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE ESTUARY OWNERS ASSOCIATION et. al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>SHELL OIL COMPANY,<br><br>        Defendant and Respondent. | A145516<br><br>(Alameda County Super. Ct. Nos. RG10550407, RG10550416, RG12628669) |

In three cases consolidated in the trial court, the Estuary Owners Association (EOA) and individual owners of condominiums built on the site of a former bulk fuel distribution terminal sued successive owners and developers of the property, as well as contractors involved in constructing the condominiums, over alleged contamination of the soil and groundwater at the site and improper construction of the condominiums. After appellants settled with various of the developers and other defendants, the trial court granted motions for summary adjudication and summary judgment in favor of Shell Oil Company (Shell), the original owner of the property, on the grounds that appellants' causes of action against it for negligence and nuisance were barred by a 10-year statute of repose, and the negligence claims also were barred by a three-year statute of limitations and failed because Shell did not owe a duty of care to appellants. Appellants argue the trial court misinterpreted their complaints and misapplied the law on each of these issues. We agree that the trial court erred in finding the statute of repose applicable but find no error with respect to the statute of limitations. Accordingly, we will affirm the judgment

1

as to the causes of action for negligence and reverse as to the causes of action for nuisance.

## STATEMENT OF THE CASE AND FACTS

The 100-unit condominium project at issue in this case was owned and used by Shell as a fuel distribution terminal from 1925 until 1980. Petroleum products were delivered to the property by pipeline and railcar, and stored in both above ground and underground storage tanks with a total capacity of 69,730 barrels (2,028,660 gallons). In 1980, the property was purchased by Simmons Terminal Corporation (Simmons), which continued to use it as fuel distribution terminal for several years. In 1985, the property was purchased by the John E. and Charlene A. Weber Trust, for use by their demolition contracting business, ICONCO, Inc. ICONCO continued to use two of the above ground storage tanks and demolished the others, leaving underground pipelines and facilities in place. In June 2003, the site was acquired by Signature at the Estuary, LLC (Signature) for the purpose of building a residential townhouse development.

In anticipation of acquisition and development, Signature's environmental consultant, Lowney Associates, reviewed the history of the site and submitted a Corrective Action Plan to the California Regional Water Quality Control Board (Water Board) in October 2002. According to the Water Board's findings, releases from the former bulk fuel terminal had first been reported in 1942[1] and investigations of soil and groundwater at the site in 1982,[2] 1985[3] and 2001 (for Simmons, Weber Trust and

---

[1] A 1942 report for the Division of Fish and Game Bureau of Fish Conservation mentioned that an oil separator was being installed at Shell's Oakland distributing depot "after an investigation of oil reaching the estuary was traced to this concern."

[2] In 1982, then-owner Simmons was required by the Water Board to determine the source of an oily sheen emanating from a storm drain discharging into the estuary from the site. Three exploratory borings were drilled and converted into ground water monitoring wells, and additional monitoring wells were installed in 1985.

[3] Additional borings/monitoring wells were installed in 1985 in response to Water Board requirements. A 1987 compliance monitoring report required ICONCO to continue operating the " 'seawall drainage system' and oil-water separator, and that

2

Signature, respectively) found "widespread petroleum hydrocarbon contamination with pockets of free product residual in soil and groundwater."

Pursuant to the 2002 corrective plan and additional plans approved by the Board, cleanup activities were performed between September 9 and December 18, 2003. These included excavation of an approximately 80,000 square foot area of petroleum-impacted soil to depths ranging from 7 to 12 feet, treatment with "oxygen release compound" to help degrade petroleum hydrocarbons, and backfill with soil that did not exceed the site cleanup goals.

As of March 2004, Water Board staff concurred that the first four of six elements in the corrective plan had been completed. In June 2004, the Water Board issued Order No. R2-2004-0046, "Adoption of Final Site Cleanup Requirements" for the site. Signature was named as a discharger "because it owned the property during or after the time of the activity that resulted in the discharge, has knowledge of the discharge or the activities that caused the discharge and has the legal ability to prevent the discharge." In October 2004, Signature submitted to the Water Board a "Risk Management Plan" which, among other things, noted that 17 ground water monitoring wells had been installed at the site in August 2004; a deed restriction had been prepared restricting future activities related to residual contamination; the Covenants, Conditions and Restrictions (CCRs) for the residential development would reference the risk management plan; and sellers of the townhouses would be required to disclose the risk management plan to future buyers.

Deed restrictions were recorded by Signature in November 2004 that detailed the history of contamination and cleanup activities at the property, set forth restrictions on development and use of the property, and required future owners and occupants to execute a written instrument to accompany all purchase agreements or leases related to the property stating recognition that the property "contains hazardous materials in soils and in the groundwater" and is subject to the deed restriction. The CCRs for the

absorbent booms continue to be used in the estuary around the storm drain outfall.' " ICONCO periodically pumped impacted ground water from the wells.

3

development, recorded in September 2004, specifically referenced the contamination at the property, the 2004 Water Board order and the risk management plan.[4] A 2004 fact sheet for the development, prepared by Signature's environmental consultant, described the contamination, cleanup activities undertaken, risk management plan and deed restrictions, and potential risk to occupants. According to this fact sheet, "no less than the upper three feet of soil beneath the site consists of either clean imported soil or clean native soil that did not require excavation," and the Water Board determined that the cleanup at the site "satisfied all aspects of the approved cleanup plan." The Water Board similarly determined that ground water cleanup satisfied the approved goals for residential use of the property. Groundwater sampling was continuing for a 50-foot strip along the shoreline because more stringent ecological cleanup goals applied for the protection of "ecological receptors" such as birds and fish, which would take longer to meet.

In October 2004, Signature sought reimbursement from Shell for its costs related to the contamination.[5] In July 2005, Signature and Shell executed a settlement agreement in which Shell denied Signature's allegations that its operations on the property caused and contributed to environmental contamination but agreed to pay Signature $1,250,000. Shell and Signature each released the other from all claims for "Covered Costs" incurred by the other relating to the property, defining "Covered Costs" as "(i) all costs and other losses incurred prior to [July 1, 2005] associated with the presence, release, migration, removal or remediation of the Contamination; (ii) groundwater monitoring costs at the Property incurred after the Effective Date up to but not to exceed $40,000; and (iii) agency fees and costs relating to environmental *oversight of the* Property incurred after

---

[4] The CCRs described the Water Board order, imposed an easement for action necessary to implement requirements of the order and achieve its goals, included compliance with the order and risk management plan among the enumerated use restrictions for the property, and required the EOA to notify contractors and employees about specified portions of the risk management plan.

[5] Signature was also pursuing reimbursement from the California Underground Storage Tank Cleanup Fund.

4

[July 1, 2005] up to but not to exceed $25,000."[6] All other claims "associated with the Property or the Contamination" were "specifically reserved by the Parties."

The condominiums were built between 2004 and 2006. In depositions, one purchaser of a condominium stated that he was told at the time of purchase that contaminants at the site had been fully remediated, another said he was assured the environmental remediation mentioned in the documents was "routine for any development around the Bay Area," and another said he was rushed through the paperwork and told everything in it was "boilerplate."

As of 2008, residual concentrations of petroleum related chemicals remained in the soil, soil gas and groundwater beneath the development. The Water Board determined that the concentrations in soil and groundwater met the required residential occupancy goals, but concentrations of certain chemicals in the soil gas exceeded the Board's criteria. In November 2008, Signature informed the Water Board that the townhouses had been constructed with moisture barriers beneath the building slabs instead of the vapor/gas barriers called for in the corrective action plan. On November 6, 2008, representatives of the Water Board attended an EOA meeting to explain the history of contamination and cleanup efforts and address residual contamination at the property. The Water Board instructed Signature to plan a pilot study to confirm the effectiveness of a proposed engineering system to prevent migration of vapors into potentially affected buildings and held a public comment period on the proposed plan.

In June 2011, the Water Board issued Order No. R2-2011-0038, amending the 2004 order by adding Shell as a named responsible party.[7] Shell had not been named

---

[6] It was additionally specified that Signature would pursue third parties such as Simmons, which was responsible for a subsurface release at the property, for costs incurred in connection with such releases and that the settlement payment was based primarily on costs and damages incurred by Signature other than in connection with historic underground storage tank releases. Shell waived any claim for reimbursement from the Tank Fund relating to the property.

[7] Signature Properties, Inc., was also named as a discharger "because it was so closely related to Signature at the Estuary, LLC, that the two entities effectively

previously because the current owner, Signature, was actively involved with site cleanup, but Signature had informed the Water Board that it did not have the financial capacity to fulfill its obligations under the final cleanup order.[8]  The order amended the groundwater cleanup standards to protect "drinking water beneficial use" that had previously not been included because it had been determined that site groundwater did not qualify as a potential source of drinking water, and added soil gas cleanup standards because monitoring performed after remedial action at the site indicated residual compounds presenting concern for vapor intrusion into indoor air.  Subsequently, on July 11, 2014, the Board issued a directive to Shell to submit a work plan including further investigation into historical data regarding its pipelines.  The Board later approved the plan Shell submitted.

The initial complaints in this case were filed by EOA on December 8, 2010; by Elaine Kammerer and other homeowners on the same date; and by Beverly Angros and other homeowners on May 3, 2012.  Shell was not initially named as a defendant in the EOA and Kammerer actions but, as the trial court later noted, was added as a Doe defendant on January 27, 2012, "after being ordered by the State to participate in the cleanup of the property."  The operative complaints are the first amended complaint filed by the Angros plaintiffs on December 20, 2012,  the first amended complaint filed by the Kammerer plaintiffs on March 8, 2013,  and the second amended complaint filed by EOA on January 15, 2014.  The three cases were consolidated for pretrial purposes.

_____

functioned as one."  Signature Properties, Inc., had begun work with the Board before Signature at the Estuary, LLC, was formed and acquired the property.

[8] The Board's order stated that Shell had been the owner and operator of the fuel distribution terminal from 1925 to 1980 and owned two associated product pipelines that were used to deliver petroleum products to the terminal; that releases from the terminal had first been reported in 1942, that "an oil recovery system consisting of extraction wells, stormwater drainage controls, oil-water separator and oil absorbent booms" reportedly had been operated at the property from the early 1970s to the late 1980s, and that in addition to fuel tanks and appurtenances on the site, "a suspected source of residual petroleum contamination at the site is impacted soil and/or groundwater as a result of leakage from Shell's pipelines."

The operative complaints named the same defendants, grouped into four categories: "Developer Defendants" (Signature, Signature Properties, Inc., Signature Development Group, Inc., Signature Homes, Inc., James C. Ghielmetti and Michael J. Ghielmetti),[9] "Design Professionals" (TRC Lowney Inc., TRC Solutions, Inc. and KTGY Group, Inc.),[10] "Subcontractors" (Gonsalves & Santucci, Inc., d/b/a ICONCO),[11] and "prior owners, lessors, lessees and/or users of the Subject Property" (Shell, John Weber and Charlene Weber, individually and as trustees of the 1994 John E. Weber and Charlene A. Weber revocable trust, and ICONCO).[12] With respect to Shell, the only defendant involved in this appeal, the complaints all alleged causes of action for negligence, private nuisance and public nuisance, and EOA additionally alleged a cause of action for negligence per se.

The complaints[13] alleged that all the defendants "participated in the development, design, construction, and/or repair of the Subject Property, and/or in the manufacture

_____

[9] Each of these defendants was alleged to be "doing business as a contractor, developer, producer and/or seller of homes and/or residences," and the Ghielmettis were alleged to be alter egos of the "entity Developer Defendants."

[10] These defendants were alleged to be "doing business designing, supervising, doing general and specialty contractor and subcontractor's work, providing engineering and architectural services, for the construction of residential real property," and the TRC defendants were alleged to have had responsibility for "remov[ing] contaminated soil from the Subject Property."

[11] This defendant was alleged to do "general and specialty contractor and subcontractor's work, for the construction of residential real property."

[12] Shell was described as "in the business of the manufacture, distribution and sale of petroleum products and is and was a prior owner, lessor, lessee and/or user of the Subject Property as a bulk fuel/petroleum storage and/or distribution site."

[13] For simplicity, we will refer to EOA's second amended complaint as representative, and as "the complaint." Any material differences in the other operative complaints will be indicated as relevant.

In addition to the causes of action noted in the text, which were alleged against the other defendants as well as Shell, all the operative complaints alleged causes of action against defendants *not* including Shell: breach of express warranty, negligent misrepresentation, breach of contract and fraud/non-disclosure (against the Developer

7

and/or supply of materials and components which were made a part of the Subject property as set forth herein and/or were previously in possession of the Subject Property as owner, lessor, lessee and/or user of the site." It was alleged that the Developer Defendants, Design Professionals and Subcontractors "acted in unity and concert to produce the Subject Property . . . as part of a planned development" and "the Subject Properties were manufactured products" and these defendants "were manufacturers, suppliers and assemblers of said products." While the property was being used in the manner it was intended to be used, EOA allegedly became aware of deficiencies: The soil and/or groundwater was contaminated with harmful petroleum-based chemicals; the site was improperly prepared with regard to removing contaminates and importing clean fill; the buildings were not constructed with proper vapor and/or moisture barriers beneath the concrete slabs; the slabs were improperly constructed in that they allowed excessive moisture and/or vapor containing harmful contaminates to enter the structures; the tidal influence of the adjacent estuary caused contaminates to permeate the site soil with fluctuating volume and concentration; and the buildings were inadequately ventilated given the increased likelihood of harmful vapors entering them.[14] It was alleged that each of the defendants "failed to satisfy and/or breached" their obligations with respect to conditions of approval for the project, covenants running with the land, orders from the Board, monitoring conditions at the site, and cleaning up the site, and attempted to shift responsibility to EOA, creating financial hardship and obligations not

Defendants), breach of implied warranty and breach of contract/third party beneficiary (against the Developer Defendants, Design Professionals and Subcontractors), and strict liability/products liability (against the Developer Defendants and Subcontractors). EOA also alleged causes of action for strict liability (against the Developer Defendants) and strict liability/products liability (as to the Developer Defendants and Subcontractors). The individual plaintiffs alleged a cause of action for unfair business practices (Civ. Code, §§ 17200, 17500) against the Developer Defendants that was not alleged in EOA's complaint.

[14] EOA's complaint included detailed allegations concerning specific deficiencies in the construction of the project, alleged against the Developer Defendants only. These allegations were not included in the complaints of the individual plaintiffs.

8

disclosed at the point of sale.  It was further alleged that the defects "were a result of deficiencies in the design, development and/or construction and prior use of the Subject Property," that EOA and its members were not aware of these deficiencies when the property was purchased, and that the defects made the property "unsafe, unmarketable and unsuitable for its intended use."

The cause of action for negligence alleged that all the defendants "participated in the development, design, construction, renovation, repair and/or sale of the Subject Property, and/or performed repairs and/or major renovations or improvements and/or in the manufacture and/or supply of materials and components which were made a part of the Subject Property," or "performed works of labor and manufactured and/or supplied materials, equipment, and/or services necessary for the construction, including supervision of construction of the Subject Property, or were prior owners, lessors, lessees, users and/or occupiers of the Subject Property."  Based on having undertaken responsibility and authority for these actions "and/or based on such prior possession and use," the defendants owed EOA a duty of care to perform the activities in a "reasonable, competent and workmanlike manner so that the completed project would be free from defects and would require only normal maintenance," and the defendants breached the duty of care with respect to various aspects of the design and construction of the property, and "also contaminated the Subject Property and/or failed to properly clean up the Subject Property and remove said contamination."  Appellants alleged that, exercising reasonable diligence, they could not and did not discover the nature and cause of the defects until times within the three years prior to filing the action.

The two causes of action for nuisance alleged that all the defendants interfered with plaintiffs' use and enjoyment of the property by "developing, designing, and/or constructing, contaminating, occupying and maintaining the Subject Property in an area where the soil, air and water is contaminated and harmful to health and safety and was not properly cleaned and/or decontaminated prior to the construction of the Subject Property."  It was further alleged that the interference was substantial and unreasonable and required plaintiffs to incur significant expenses for remediation to mitigate, reduce or

9

abate the harm, and that the harm to the property was continuing. The cause of action for public nuisance additionally alleged that the nuisance affected others who were not plaintiffs in the action and that the seriousness of the harm outweighed any public benefit.

The last cause of action applicable to Shell, negligence per se, alleged that all the defendants were involved with the design and construction of the development in similar terms to the allegations of the negligence cause of action,[15] and that their conduct violated various codes, regulations, statutes and/or ordinances establishing minimum building standards and prohibiting "certain activities to prevent and/or mitigate against contamination of soil, air and water" in order to "safeguard life, health, property, and public welfare" and protect plaintiffs and others similarly situated from the type of injury alleged in the complaint.

Shell answered the complaints, denying the allegations and raising a number of affirmative defenses. On September 9, 2014, Shell moved for summary judgment or summary adjudication, arguing that the causes of action for negligence, negligence per se, private nuisance and public nuisance were all barred by the 10-year statute of repose for claims involving latent construction defects (Code Civ. Proc., § 337.15);[16] the causes of action for negligence and negligence per se were additionally barred by the three-year statute of limitations (§ 338, subd. (b)); the causes of action for nuisance were also barred by the three-year statute of limitations except to the extent appellants were pursuing a theory of continuing nuisance, for which appellants could not recover "damages sustained more than three years from the filing of their respective actions," damages based on

_____

[15] Specifically, it was alleged that the defendants were "designers, developers, builders, contractors, subcontractors, suppliers, manufacturers, or were other persons, entities or professionals who participated in the process of construction and/or repair and/or renovation and conversion of the Subject Property and who performed works of labor and manufactured and/or supplied materials, equipment, and/or services necessary for the construction, including supervision of construction of the Subject Property or were prior owner, lessors, lessees, users and/or occupiers of the Subject Property."

[16] Further statutory references will be to the Code of Civil Procedure unless otherwise specified.

diminution in the value of their property or prospective damages including future remediation costs; appellants could not establish an essential element of the causes of action for negligence, private nuisance and public nuisance because Shell did not owe them a duty of care; and appellants could not establish an essential element of the cause of action for private nuisance because their "predecessor-in-interest was aware of and consented to the use of the property as a fuel distribution terminal when it purchased the site" from Shell.

On March 5, 2015, the day set for hearing on Shell's motion for summary judgment, appellants filed a motion for leave to file a third amended complaint. Appellants had reached settlements with the Developer Defendants, Design Professionals and Subcontractors, and the proposed amendment sought to delete the parties that had settled and two causes of action; add a cause of action for trespass; add Simmons, which appellants indicated had been added as a Doe defendant on July 9, 2013, but "erroneously omitted from the caption of the second amended complaint";[17] and identify certain Doe defendants (Shell California Pipe Line Corporation, Shell Pipeline Company, L.P, Shell Pipeline GP, LLC, Shell California Pipeline Company, LLC and Shell California Pipeline Company).

The trial court heard arguments on Shell's motion for summary judgment and took it under submission. On March 12, 2015, the court granted the motion for summary judgment, finding that the negligence causes of action were not supported because Shell owed no duty of care to appellants and were barred by the applicable three-year statute of limitations, and that all the causes of action were barred by the 10-year statute of repose for latent construction defects.[18] Judgment for Shell was entered on March 26, 2015.

---

[17] The court noted in its order granting summary judgment that on February 5, 2014, over Shell's objection, the court had granted appellants' application to substitute these affiliates of Shell as Doe defendants, with the amendments to be filed no later than February 24, 2015, but that appellants did not appear to have filed the proposed amendments prior to the filing of the motion for summary judgment.

[18] The trial court denied the motion as to Shell's additional arguments.

On April 1, 2015, the court denied appellants' motion for leave to amend the complaint, which it viewed as "effectively an end-run around the court's summary judgment order." Shell's opposition had pointed out, among other things, that the motion for leave to amend was not filed until after the court had issued its tentative ruling granting Shell's motion for summary judgment.

Appellants filed a motion for new trial on April 24, 2015, asking the court to vacate its judgment with respect to application of the 10-year statute of repose under section 337.15 to the claims of continuing nuisance. Appellants argued that the statute of repose could apply only if construction defects attributable to Shell in the capacity of a developer were the sole proximate cause of contamination, and there was no evidence this was the case. Appellants emphasized that Shell was sued in its capacity as a prior owner, lessor, lessee and/or user of the property and excluded from the definition of "Developer Defendants," and argued there was no evidence that the contamination that occurred during Shell's ownership of the property was due to construction defects in the design or development of the property attributable to Shell as opposed to Shell's activities in operating on the site, such as oil spills documented in the record. Shell maintained it was only required to show that it developed the property and suit was filed more than 10 years after the terminal was completed, and the burden then shifted to appellants to raise a triable issue of fact as to "some other injury or harm that falls outside of 337.15."

The court issued its tentative ruling denying the new trial motion on May 21, 2015, and, after a hearing, entered its order denying the motion on May 27, 2015.

Appellants filed their timely notice of appeal on June 24, 2015.

**DISCUSSION**

Appellants contend the trial court erroneously read their complaints as alleging claims against Shell based on construction defects, whereas in fact the gravamen of their claims is Shell's "negligent mishandling of petroleum products and subsequent failure to

12

remediate, which created a continuing nuisance." As a result of this misreading, appellants assert, the trial court erroneously applied section 337.15 to bar all their claims. Additionally, they argue that the trial court, in finding their negligence claims barred by the three-year statute of limitations, failed to recognize that the claims were for new and different damage to their property than that associated with Shell's pre-1980 activity on the site. Appellants maintain that they did not experience "appreciable harm" to their property until their units and common areas were contaminated by the spread of Shell's contamination to the new fill and top soil, and that they did not learn of this damage and claim against Shell until November 2008 or later.[19] Asserting that they raised triable issues of fact with respect to all these causes of action, appellants seek reversal of the summary judgment.

"A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment has the initial burden of showing either that one or more elements of the cause of action cannot be established or that there is a complete defense. (§ 437c, subd. (p)(2).)" (*Perry v. East Bay Regional Park Dist.* (2006) 141 Cal.App.4th 1, 8.) "The moving party must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial." (*Chevron U.S.A., Inc. v. Superior Court* (1992) 4 Cal.App.4th 544, 548, overruled on other grounds in *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1245; *Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1543.) "If that initial burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (§ 437c, subd. (p)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–853.)" (*Perry*, at p. 8; *Asplund v. Selected Investments in Financial Equities,*

---

[19] Appellants also contend the trial court erred in finding Shell had no duty to avoid or remediate contamination on the site. As will be seen, our resolution of other issues makes it unnecessary for us to reach the question of duty.

13

*Inc.* (2000) 86 Cal.App.4th 26, 36.) "When the defendant, as the moving party, makes that showing, the burden of proof shifts to the plaintiff, as the opposing party, to show, by responsive separate statement and admissible evidence, that triable issues of fact exist. (*Lorenzen-Hughes v. MacElhenny, Levy & Co.* (1994) 24 Cal.App.4th 1684, 1688; Code Civ. Proc., § 437c, subd. (o)(2).) ' "[An] issue of fact becomes one of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion. [Citation.]" [Citation.]' (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1450.)" (*Shapiro*, at p. 1543.)

" 'This court reviews de novo the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951. . . .)' (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 (*Hersant*).)" (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107), liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor. (*Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514, 1517; *Kaplan v. LaBarbera* (1997) 58 Cal.App.4th 175, 179.)" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768– 769.) "We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. ([*Hersant*, at p. 1001].) However, to defeat the motion for summary judgment, the plaintiff must show ' "specific facts," ' and cannot rely upon the allegations of the pleadings. (*Ibid.; Snyder v. United States Fidelity & Guarantee Co.* (1997) 60 Cal.App.4th 561, 565.)" (*Horn*, at p. 805; *Regents of University of California v. Superior Court* (1996) 41 Cal.App.4th 1040, 1044.) "[D]ue to the drastic nature of the procedure, all doubts about the propriety of granting the motion must be resolved in favor of its denial." (*Asplund v. Selected Investments in Financial Equities, Inc., supra,* 86 Cal.App.4th at pp. 36–37.)

**I.**

Section 337.15, subdivision (a), provides:  "No action may be brought to recover damages from any person, or the surety of a person, who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement to real property more than 10 years after the substantial completion of the development or improvement for any of the following:  [¶]  (1)  Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property.  [¶]  (2)  Injury to property, real or personal, arising out of any such latent deficiency."

The trial court, in finding that section 337.15 barred this action, viewed appellants' claims as based on Shell's pre-1980 "development and use" of the property as a bulk fuel terminal.  Appellants contend the trial court misread their complaints, arguing, as they did in the trial court, that their claims against Shell are based on the theory that the property became contaminated as a result of fuel spills over the course of the many years Shell operated a fuel distribution facility on the site, not due to any defect in the design or construction of the facility itself.  In their view, section 337.15 has no application because they do not allege that Shell's liability is related to a *construction defect*.  They further contend the trial court erred in applying section 337.15 based on Shell's "operation" of the fuel distribution terminal.

Section 337.15 "was enacted in 1971 by the Legislature to provide a 'firm and final' outside limitation period for construction suits involving claims for latent defects.  (*Lantzy* [*v. Centex Homes* (2003)] 31 Cal.4th [363,] 377.)  ' "[T]he purpose of section 337.15 is to protect contractors and other professionals and tradespeople in the construction industry from perpetual exposure to liability for their work.  [Citations.]  The statute reflects a legitimate concern that 'expanding concepts of liability could imperil the construction industry unless a statute of limitations was enacted.'  [Citation.]  Such concerns legitimately include the prohibitive cost of insurance against a perpetual and never ending risk."  [Citation.]'  (*Id.,* at p. 374.)"  (*Acosta v. Glenfed Development*

*Corp.* (2005) 128 Cal.App.4th 1278, 1294; *Gundogdu v. King Mai, Inc.* (2009) 171 Cal.App.4th 310, 315.)

Section 337.15, by its terms, does not extend protection to a person or entity who *operates* an improvement to real property once it has been constructed, only to one who "*develops* real property or performs or furnishes the *design, specifications, surveying, planning, supervision, testing,* or *observation* of *construction* or *construction* of an improvement." (§ 337.15, subd. (a), italics added.) In addition to its express language, this is evident from the statute's provisions that the 10-year limitations period begins to run upon "the substantial completion of the development or improvement" (§ 337.15, subd. (a)) and "not later than" the earliest of four dates: "final inspection by the applicable public agency," "recordation of a valid notice of completion," "use or occupation of the improvement," or "[o]ne year after termination or cessation of work on the improvement." (§ 337.15, subd. (g).) "The date of substantial completion shall relate specifically to the performance or furnishing design, specifications, surveying, planning, supervision, testing, observation of construction or construction services by each profession or trade rendering services to the improvement." (*Ibid.*) Thus, the critical point is completion of the improvement, or aspect of the improvement, for which a given defendant is responsible: The period of repose commences when the specific improvement alleged to be defective is substantially complete even if it is part of a larger development that is completed later, and, as to a particular subcontractor, upon completion of that subcontractor's work, not the total development of which it is part. (*Liptak v. Diane Apartments, Inc.* (1980) 109 Cal.App.3d 762, 772-773 [damage to home built in second phase of development due to defective grading and filling of slope in another part of development several years earlier; repose period began to run as to grading contractor when grading completed].)

The trial court relied upon *Gaggero v. County of San Diego* (2004) 124 Cal.App.4th 609 (*Gaggero*), and Shell argues this case is dispositive. The plaintiffs in *Gaggero* purchased property on which the county had previously operated a landfill. (*Id.* at p. 613.) Subsequently, structures the plaintiffs had built on the property were damaged

16

by subsidence that the plaintiffs alleged was due to "defective design and operation" of the landfill, in that decomposing material produced methane gas that created void pockets in areas beneath the landfill covering. (*Ibid.*) *Gaggero* affirmed the trial court's summary judgment in favor of the county based on section 337.15, holding that "[a]ny claim growing out of failure on the part of the county in its construction *or operation* of the landfill was governed by section 337.15." (*Gaggero*, at p. 619, italics added.)

*Gaggero* did not elaborate upon its references to the defendant's "construction or operation" of the landfill or explain why "operation" of an improvement would come within the terms of section 337.15. The issue in that case was whether the landfill was an "improvement" within the meaning of section 337.15. The court observed that the "broad interpretation" cases had given to the term "improvement" was consistent with the history and purpose of section 337.15 to " ' "protect developers of real estate against liability extending indefinitely into the future." ' " (*Gaggero*, *supra*, 124 Cal.App.4th at pp. 616-617, quoting *Martinez v. Traubner* (1982) 32 Cal.3d 755, 760.)

The only other case we are aware of that refers to section 337.15 as applicable to a defendant's "operation" of an improvement is a later decision by a different panel of the same court that decided *Gaggero,* also involving a landfill, which quotes *Gaggero* on this point. (*San Diego Unified School Dist. v. County of San Diego* (2009) 170 Cal.App.4th 288 (*San Diego Unified*).) In *San Diego Unified,* the county had operated a landfill on property leased from the school district; after the landfill ceased operation, the school district built a school on the property. (*Id.* at p. 295.) When environmental legislation enacted years later led to the imposition of monitoring and cleanup responsibilities, the parties entered an agreement dividing these between them. (*Ibid.*) Ultimately, the school district sued the county, alleging various causes of action based on alleged violations of the agreement and interference with the school district's use of the property. (*Id.* at pp. 296-297.) *San Diego Unified* held that the landfill was an "improvement" within the meaning of section 337.15, but reversed the trial court's order finding all the claims barred because the claims went "beyond those of damage caused by a latent deficiency in an improvement to real property," instead alleging violations of the parties' cost sharing

17

agreement and obligations imposed by environmental legislation and regulations that would apply even if the landfill was designed, constructed and operated perfectly. (*San Diego Unified*, at pp. 305-306, 308-311.)

Like *Gaggero, San Diego Unified* did not elaborate upon the reference to "operation" of the improvement falling within the reach of section 337.15. Significantly, however, both cases considered the "date of completion" of the improvement to be the date the landfill ceased operation. (*San Diego Unified, supra,* 170 Cal.App.4th at pp. 293, 295; *Gaggero, supra,* 124 Cal.App.4th at p. 613.) *San Diego Unified* quoted *Gaggero*'s reasoning in finding that "the County's construction and operation of 'the landfill was an improvement within the meaning of section 337.15' ": " 'While the county's primary goal may not have been to obtain a profit from eventual sale of the landfill, in filling it, covering it and selling it, the county was engaged in making the real property suitable for further use by others. Section 337.15 and the cases which have interpreted it make clear, in enacting the statute, the Legislature's unambiguous intention was to put a temporal limit on liability for individuals and entities engaged in these sorts of purposeful alterations to and transfers of real property.' " (*San Diego Unified,* at p. 304, quoting *Gaggero*, at pp. 617-618.)[20] As we understand it, *Gaggero* and *San Diego Unified* viewed *operation* of the landfill to be an inherent part of the improvement's *construction*; the landfill was "complete" so as to trigger the 10-year period of section 337.15 at the point the construction and operation of the landfill ceased and the property became available for other uses.

In our view, these cases cannot be taken outside the context of landfills to conclude that "operation" of an improvement to real property after it has been fully constructed comes within the ambit of section 337.15. The purpose of section 337.15 and its definition of the "substantial completion" that begins the running of the 10-year period make clear that the statute's protection applies to claims for damage due to defects in

---

[20] The *San Diego Unified* court noted that it did not interpret this statement in *Gaggero* as limiting coverage under section 337.15 to situations in which the property at issue has been transferred. (*San Diego Unified, supra,* 170 Cal.App.4th at p. 304.)

how an improvement was designed and constructed, not to claims based on how the improvement was used *after* its construction is complete and independent of the manner in which it was designed and constructed. For this reason, the trial court in the present case erred in holding that to the extent appellants' claims were based upon "fuel spills during the operation of the fuel terminal, not upon faulty construction of the terminal," they would still be barred by section 337.15.

Section 337.15 can bar *only* claims alleging injury caused by latent construction defects. (*San Diego Unified, supra,* 170 Cal.App.4th at p. 301.) As summarized in *San Diego Unified,* section 337.15 bars "(a) an untimely action for damages (b) based on a latent deficiency in construction of an improvement, (c) or based on property injury arising out of any such latent deficiency." (*San Diego Unified,* at pp. 301, 305-306; *Chevron U.S.A. Inc. v. Superior Court* (1994) 44 Cal.App.4th 1009, 1015, fn. 2 (*Chevron*).) The *San Diego Unified* court explained that its task was to "analyze the claims pled by the District to determine whether *the only rights asserted are those arising out of a latent construction defect*," in which case "section 337.15 may provide a bar for an action brought more than 10 years after the substantial completion of the improvement. Alternatively, if the District is not contending the landfill was a defectively constructed improvement, the District may be able to plead rights arising out of some other kind of legal entitlement, separate from the manner of construction of the improvement." (*San Diego Unified*, at p. 305, italics added.) Section 337.15 does not bar actions for property damage "filed more than 10 years after the improvement was completed, *if the recovery is sought on some other legal basis not identified in this statute*." (*San Diego Unified*, at p. 306, italics added; *Grange Debris Box & Wrecking Co. v. Superior Court* (1993) 16 Cal.App.4th 1349, 1354 [section 337.15 inapplicable to action alleging "contamination of soil and water, not construction defects"; cross complaint alleging negligent contamination "while excavating and preparing the site for

19

construction of an office building" within scope of section 337.15], overruled on other grounds in *Lantzy v. Centex, supra*, 31 Cal.4th at p. 367.)[21]

Here, it is clear that appellants' claims against Shell, as stated in the complaint, are based on its contamination of the site and failure to remediate that contamination.[22] The question is whether appellants' complaints allege that Shell contaminated the property *due to a construction defect in the fuel distribution facility,* as Shell argues and the trial court found, or *due to ongoing business activities on the site,* distinct from the manner in which the facility itself was constructed, as appellants contend. The complaint does not spell out *how* Shell contaminated the property other than to state that Shell owned and/or used the site as a bulk fuel storage and/or distribution site.

---

[21] *Chevron*, commenting on recent cases involving ground contamination that did not discuss section 337.15, similarly emphasized the need to determine exactly what the plaintiffs alleged: "If raised as a defense, section 337.15 would bar recovery *if the defendants* were involved in development, *were charged with latent construction defects causing injury*, and were not in possession . . . at the time the deficiencies constituted the proximate cause supporting the action." (*Chevron, supra,* 44 Cal.App.4th at p. 1015, fn. 2, italics added.) The *Chevron* court observed that "[n]either *Mangini,* which involved allegations of burning, burying, and otherwise discharging toxic wastes upon the property (*Mangini* [*v. Aerojet-General Corp.* (1991)] 230 Cal.App.3d [1125,] 1132) nor *Newhall*, which alleged contamination of soil and groundwater during operation of a natural gas processing plant (*Newhall* [*Land & Farming Co. v. Superior Court* (1993)] 19 Cal.App.4th [334,] 339) was a construction defect case," while several other cases that "may have involved leakage from underground storage tanks" (*KFC Western, Inc. v. Meghrig* (1994) 23 Cal.App.4th 1167, 1171; *Wilshire Westwood Associates v. Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 737-738; *Capogeannis v. Superior Court* (1993) 12 Cal.App.4th 668, 672) simply did not mention section 337.15. (*Chevron,* at p. 1015.)

[22] Shell argues that appellants' opening brief offers a "strawman argument" to "manufacture error where none exists" by claiming Shell was not protected by section 337.15 because it was not involved in constructing the condominium development and was not within the "protected class" of section 337.15 that extends to developers, not owners or occupiers of land. As we understand it, appellants' point was not that section 337.15 only protects "developers of real estate" and never land owners or occupiers, but that they never claimed Shell was liable based on its having developed a defective improvement, only that its activities as a landowner and occupier caused the alleged contamination.

Appellants argue that in order to establish an affirmative defense under section 337.15, Shell had the burden of producing evidence that the contamination resulted from defective construction of the fuel distribution terminal and, unless it did so, appellants had no further obligation to demonstrate that the contaminate resulted from business operations unrelated to the construction of the facility. Shell insists that it satisfied its burden of establishing all elements of the defense by demonstrating through undisputed facts that it "developed a bulk fuel terminal on the Property" and "operated the fuel terminal" there until it sold the property and operating fuel terminal to Simmons in 1980, and that appellants did not initiate any of the consolidated actions until 2010. The burden then fell to appellants, Shell maintains, to produce evidence raising a triable issue of fact as to whether the contamination resulted from a latent construction defect.

Shell's argument might be availing if appellants' claims were based solely upon the theory that the property was contaminated during Shell's ownership and use *due to a defect in construction of the fuel distribution terminal.* This appears to be the conclusion the trial court drew, but neither the reasoning expressed in its orders nor Shell's arguments here support that conclusion. The court noted that appellants' opposition to summary judgment "did not explain what claims, other than for a latent defect in the property, plaintiffs have pleaded against [Shell]." At the page cited by the court, appellants' opposition stated, "[p]laintiffs' claims against Shell are not for latent construction defects and therefore the ten (10) year statute of repose for such actions does not apply." While it is true that appellants did not further elaborate at this point, it is clear from their argument at the hearing on the motion for summary judgment that, in their view, they never alleged a claim against Shell based on construction defect: Counsel repeatedly reiterated at the hearing that the claims against Shell were based on contamination of the property that resulted not from a defect in the construction of the fuel distribution facility but from negligence during the course of operations on the property that resulted in petroleum being spilled on the ground.

Moreover, we are unable to find support in the record for the trial court's conclusion that appellants "disclaimed" reliance on the "prior contamination" theory in

21

favor of a theory that Shell's liability was based on its failure to disclose the extent of contamination and failure to comply with the duties imposed after the Board named it a responsible party in 2011.  The court cited two pages of the opposition, at which appellants complained that Shell had "frustrated [their] efforts to obtain historical information concerning prior contamination and spills at the project during its ownership," that despite this discovery issue appellants also alleged Shell was negligent for failing to disclose to anyone the extent and degree of the contamination "(i.e., disclosure of prior significant product spills)" and necessary remediation, and that they alleged Shell had been negligent for failing to perform its duties as a named responsible party under the Board's directives.  But the opposition raised these arguments *in addition* to claims based on the original contamination of the property, not *in place of* those claims.  Notably, Shell does not suggest in its briefs on appeal that appellants disclaimed reliance upon the prior contamination theory.

Contesting appellants' argument that they did not allege liability based on latent defects against Shell, Shell argues that the negligence and nuisance claims were asserted against *all* defendants, "lumped together indiscriminately in allegations that explicitly reference damages caused by latent deficiencies."  Shell points to three paragraphs in the cause of action for negligence, and one in the cause of action for nuisance, with emphasis as follows:  "*Defendants . . . and each of them*, participated in the development, design, construction, renovation, repair and/or sale of the Subject Property . . . or were prior owners, lessors, lessees, users and/or occupiers of the Subject Property"; "the design, materials, and/or construction defects and related damages as described in, and each of them, were at all material times latent and could not have been discovered by plaintiff through the exercise of reasonable diligence and/or by reasonable inspection"; "as a proximate result of the defects set forth herein and the conduct of *defendants*, plaintiff has suffered damages . . ."; and "*defendants and each of them,* have interfered with and continue to interfere with plaintiff's use and private enjoyment of the Subject Property, namely by developing, designing, and/or constructing, contaminating, occupying and maintaining the Subject Property in an area where the soil, air and water is contaminated

22

and harmful to health and safety and was not properly cleaned and/or decontaminated prior to the construction of the Subject Property as alleged in paragraph 26 above so as to constitute a private nuisance."

To be sure, these allegations, particularly the last one, are sloppy. But as the first quoted allegation makes clear, the complaints did not attribute each and every action or status to each and every defendant; it alleges that each and every defendant was responsible for one *or* another of the described actions, *or* held the status of owner, lessor, lessee, user or occupant. Read as a whole, it is apparent that appellants sought to impose liability upon certain defendants—denominated developers, design professionals and contractors—for latent defects in the design and construction of the condominium development, and upon Shell for contaminating the property and failing to remediate the contamination. The *construction defects* alleged in the complaints pertained to the condominiums; no allegation referenced any *construction defect* related to Shell's fuel distribution terminal. That Shell "developed" the site is not sufficient if that development was not alleged to involve a construction defect. At most, the sloppy drafting of the complaint left some ambiguity as to whether Shell's alleged liability was based on contamination due to a defect in the construction of its facilities or contamination due to negligent operation of those facilities. But the complaint cannot reasonably be read to involve *only* claims based on construction defects. (See *San Diego Unified, supra,* 170 Cal.App.4th at p. 305.)

As we have said, section 337.15 can provide a bar only to claims based on construction defects. (*San Diego Unified, supra,* 170 Cal.App.4th at pp. 305-306, 310-311 [statute inapplicable to claims based on violation of contractual and statutory duties to remediate pollution that applied regardless of how perfectly landfill was constructed]; *Gaggero*, *supra*, 124 Cal.App.4th at p. 613 [statute barred claims alleging that faulty construction and operation of landfill resulted in subsidence]; *Chevron, supra,* 44 Cal.App.4th at p. 1012 [statute barred claims that soil contamination was due to faulty installation of underground fuel storage tanks on the property].) Since appellants' claims were based on Shell's contamination of the site in the course of its business operations,

23

not on a construction defect, the summary judgment cannot be upheld on the basis that all appellants' claims were barred by section 337.15.

## II.

Aside from the section 337.15 statute of repose, the trial court found appellants' negligence claims barred by the three-year statute of limitations for injury to real property. (§ 338, subd. (b).) Relying upon the rule that a cause of action does not accrue until all elements of the claim are present (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807), appellants argue that their negligence claims against Shell did not accrue until they learned that earlier contamination of the site had combined with negligence of defendants other than Shell to contaminate the newly installed layer of top soil and the condominium structures, and that the earlier contamination was due to Shell's wrongdoing. Noting the trial court's finding that some of the plaintiffs were told of past contamination that had been remediated, and others were not told of any history of contamination, appellants argue that there were triable issues of fact as to when the individual plaintiffs and EOA incurred appreciable harm and were put on inquiry notice of claims against Shell.

"[A] cause of action for damage to real property accrues when the defendant's act causes ' "*immediate* and *permanent* injury" ' to the property or, to put it another way, when there is '[a]ctual and appreciable harm' to the property." (*Krusi v. S.J. Amoroso Construction Co.* (2000) 81 Cal.App.4th 995, 1005 (*Krusi*), quoting *CAMSI IV v. Hunter Technology Corp*. (1991) 230 Cal.App.3d 1525, 1534 (*CAMSI*).) Under the discovery rule, although all conditions for accrual of the cause of action exist, the limitations period does not begin to run until " 'the plaintiff discovers or should have discovered all facts essential to his cause of action [citations],' which is to say 'when "plaintiff either (1) actually discovered his injury and *its negligent cause* or (2) could have discovered injury *and cause* through the exercise of reasonable diligence [italics added]." [Citations.]' (*Leaf v. City of San Mateo* (1980) 104 Cal.App.3d 398, 407; cf. *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109; *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99; *Allen v. Sundean* (1982) 137 Cal.App.3d 216, 222.) The rule is 'based on the notion that

24

statutes of limitations are intended to run against those who fail to exercise reasonable care in the protection and enforcement of their rights; therefore, those statutes should not be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence. [Citations.]' (*Saliter v. Pierce Brothers Mortuaries* (1978) 81 Cal.App.3d 292, 297.) The rule has been applied in tort actions of various kinds, including cases which involve nonobvious (or latent) injuries to real property. (E.g., *Allen*, at p. 222; *Leaf*, at pp. 407-409.)" (*CAMSI*, at p. 1536.)

"In an action involving tortious injury to property, the injury is considered to be to the property itself rather than to the property owner, and thus the running of the statute of limitations against a claim bars the owner and all subsequent owners of the property. (*Wilshire Westwood Associates v. Atlantic Richfield Co.*, *supra*, 20 Cal.App.4th at pp. 739-740; *CAMSI*[, *supra,*] 230 Cal.App.3d [at pp.] 1534-1535.) In other words, the statute of limitations does not commence to run anew every time the ownership of the property changes hands." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1216.) A cause of action for harm to real property "belongs to the owner who first discovered, or ought to have discovered, the property damage." (*Siegel v. Anderson Homes, Inc.* (2004) 118 Cal.App.4th 994, 1009 (*Siegel*).) That owner "may choose to deliberately transfer that cause of action to another, but without some clear manifestation of such an intention, the cause of action is not transferred to a subsequent owner." (*Krusi*, *supra,* 81 Cal.App.4th at p. 1005.) The actual and constructive knowledge of the prior landowner is imputed to the current landowner for purposes of the discovery rule. (*CAMSI*, at p. 1537.)[23]

Here, undisputed evidence demonstrates that prior landowners were aware of the contamination of the property. Even putting aside earlier owners of the site, there is no

_____

[23] As has been observed, "[i]f a prior owner knows about defects and fails to sue the developer or inform the current owner, the current owner is not unduly restricted if allowed to sue only the prior owner for concealing the defects (inflating the price of the property)." (*Valenzuela v. Superior Court* (1992) 3 Cal.App.4th 1499, 1503.)

question that Signature was aware of the contamination of the parcel upon which the condominiums were built and of Shell's role in causing it by 2002 at the latest, when its environmental consultant investigated the site and prepared the 2002 corrective action plan for the Water Board. Signature was required to remediate the contamination before building on the property and it later entered a settlement with Shell concerning the costs of that remediation. As the trial court noted, assuming Signature would have had a cause of action against Shell for the contamination of the property, there is no evidence it transferred that cause of action to appellants, and certainly not within the three-year statute of limitations. Appellants do not contend otherwise.

Appellants' argue, however, that Signature's knowledge of the contamination before it developed the site is irrelevant because appellants' claims are for new and different damage which occurred later—the contamination of the new topsoil placed after remediation efforts on the site, and the damage to the condominiums built on the site. "A cause of action cannot have accrued before there was someone in a position to actually assert it" (*Siegel, supra,* 118 Cal.App.4th at p. 1014), and, appellants maintain, Signature could not have learned of the damage to the new top soil and to the condominiums until that damage occurred. Appellants emphasize that their claims are for damage to "*their* property," apparently to distinguish the condominiums from the land upon which the condominiums were built. The relevant question, they maintain, is when *appellants* learned or were put on inquiry notice of the damage to their *condominiums*.

The accrual of a cause of action for property damage in favor of a prior owner does not prevent a cause of action accruing in favor of a subsequent owner against the same defendant if the damage suffered by the subsequent owner "is fundamentally different from the earlier type." (*Krusi, supra,* 81 Cal.App.4th at p. 1006.) We offered an example in *Krusi*: "[I]f owner number one has an obviously leaky roof and suffers damage to its building on account thereof, a cause of action accrues to it against the defendant or defendants whose deficient design or construction work caused the defect. But, if that condition goes essentially unremedied over a period of years, owners two and three of the same building have no such right of action against those defendants, unless

26

such was explicitly (and properly) transferred to them by owner number one. But owners two and three could well have a cause of action against those same defendants for, e.g., damage caused by an earthquake if it could be shown that inadequate seismic safeguards were designed and constructed into the building. Such is, patently, a new and different cause of action." (*Ibid.*)

Appellants see the harm they suffered as fundamentally different from any Signature could have suffered because the buildings they claim were damaged did not exist at the time Signature became aware of the contamination of the soil at the site. What they ignore is the fact that the damage they claim is due to the same contamination —their claimed injuries are the result of effects of the soil contamination entering their buildings. They try to avoid this conclusion by characterizing the contamination of the newly placed topsoil as "new" contamination, since the site had been cleared after the cleanup efforts that concluded with the placement of this new topsoil and contamination was found in the new soil only later, after the condominiums were constructed. But there was no new act by Shell to produce this newly discovered contamination, which was described by the Board as "residual" contamination. The contamination Signature was aware of and required to remediate in order to proceed with residential construction on the site was the same contamination appellants claim is now damaging their condominiums—allegedly because the contamination was not sufficiently remediated and, with respect to other defendants but not with respect to Shell, because the design and construction of the condominiums did not sufficiently protect against intrusion of contaminated water and/or vapors from the contaminated soil and/or groundwater on the site. As the trial court concluded, that the damage appellants allege is different in "degree or extent" does not make it a different type of harm from what Signature suffered. (*Krusi, supra,* 81 Cal.App.4th at p 1007 [increased leaks causing additional

27

damage after plaintiff purchased property not different type of harm from leaks experienced by prior owner].)[24]

Appellants also argue that knowledge of land contamination does not equate to "knowledge of harm," again trying to make the point that Signature's knowledge of the land contamination, as prior owner, did not mean it had knowledge of the harm that contamination later did to the buildings. In *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236 (*Alexander*), upon which appellants rely, residents of a housing complex were told that the land their housing was built upon was contaminated, but that the contamination did not pose adverse health risks; later, an attorney's investigation suggested the site contamination could be the cause of illnesses from which residents were suffering. (*Id.* at pp. 1243, 1246, 1254.) The *Alexander* court concluded that it could not determine as a matter of law whether the plaintiffs' causes of action for *personal injury* accrued at the time residents were told of the land contamination because more than one reasonable inference could be drawn as to whether notice of the land contamination should have caused the plaintiffs to suspect it caused a risk to their health. (*Id.* at pp. 1255-1256.) In holding that notice of the contamination of the *land* did not, as

_____

[24] Several cases appellants cite as support for their argument that Signature could not have known of the damage to the new top soil and condominiums until that damage occurred are inapposite to appellants' situation. *Oakes v. McCarthy Co.* (1968) 267 Cal.App.2d 231, 255, held that property owners' claims for property damage due to underground movement of the soil and fill upon which their lot was built did not accrue until "the consequential damage [was] sufficiently appreciable to a reasonable man." The case involved no issue of a prior owner's awareness of the damage. In *Siegel, supra,* 118 Cal.App.4th at pages 1009 and 1014, the damage sustained by the subsequent owner was due to a latent defect the prior owner was unaware of and not harmed by. *Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1144-1145, rejected the argument that a homeowners association did not have a cause of action for construction defects against developers because the property damage occurred before it owned the property and the prior owner did not assign the cause of action to the association. (*Id.* at pp. 1139-1140.) The court rejected this argument because the prior owner was the developer; the association was the "first entity capable of maintaining a legal claim against the developers for the construction defects . . . ." (*Id.* at pp. 1144-1146.)

28

a matter of law, put the plaintiffs on notice that the exposure to the type of contamination present might cause them physical injury, specifically distinguished cases involving claims of damage to *property.* "In *CAMSI* [*supra,* 230 Cal.App.3d 1525] and *Mangini* [*v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125], the plaintiffs alleged damage to real property based on the presence of environmental contamination. The 'injury' in both cases was the existence of the pollutants, which devalued their property. The courts, in turn, ruled that the plaintiffs' claims necessarily accrued when they were provided information indicating that their property might be contaminated with toxic materials. [¶] In contrast, appellants in this case do not seek redress for damage to real property caused by the presence of contamination at [the complex]; rather, they seek compensation for personal injuries that were allegedly caused by exposure to that contamination. Respondents have identified no portion of the complaint suggesting that, as of 2007, appellants possessed information that should have caused them to suspect that exposure to the type of contamination present at [the complex] was capable of causing them physical injury." (*Alexander,* at pp. 1258-1259.)

Alexander does not help appellants. Since their claims are for property damage, not for personal injury, they can be asserted only if they are for property damage of a different type than what Signature had knowledge of. Signature was aware that the land was contaminated due to Shell's activity on the site. Appellants' claims are based on the same contamination of the land.

Appellants also rely upon *Alexander* in arguing that the damage to the condominiums is a new and different injury, triggering a separate limitations period. Certain plaintiffs in *Alexander*, after living at the housing complex, moved to an adjacent community to which it was later discovered contamination from the housing complex site had migrated. (*Alexander, supra*, 219 Cal.App.4th at p. 1261.) Declarations indicated the plaintiffs suffered physical ailments while living both at the complex and at the adjacent location. (*Id.* at p. 1262.) The defendants argued the claims were time-barred because any injuries developed after the plaintiffs moved to the adjacent location could have been caused by the contamination at the complex. (*Ibid*.) *Alexander* rejected this

29

argument, holding that because the pleadings did not indicate when the contamination migrated from the original site to the adjacent property, the complaint could not be dismissed on timeliness grounds at the demurrer stage.  (*Ibid.*)

Appellants argue that their case also presents a question of fact as to whether "migration of the prior contamination" caused damage to their "new and different property."  But, as we have said, the property damage upon which appellants' claims are based is due to the same contamination of the same site as the contamination prior owners were aware of and attempted to remediate.

Appellant's reliance upon *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192 (*Aryeh*), is no more availing.  *Aryeh* applied the theory of "continuous accrual," under which "separate, recurring invasions of the same right can each trigger their own statute of limitations."  (*Id.* at p. 1198.)  The plaintiff, who leased copier machines, claimed that the defendant periodically imposed charges on monthly invoices that were unfair and fraudulent under the Unfair Competition Law (Bus. & Prof. Code, § 17200 (UCL)).  (*Aryeh,* at pp. 1189-1190.)  The first of the alleged instances occurred outside the four-year limitations period, others occurred within it.  (*Id.* at pp. 1190, 1197.)  Because the defendant's duty not to impose unfair charges in monthly bills was "a continuing one, susceptible to recurring breaches," each alleged breach triggered a new statute of limitations; the plaintiff could not recover for breaches preceding the limitations period but could maintain the suit for alleged charges "within the four years preceding suit."  (*Id.* at pp. 1200-1201.)

*Aryeh* also discussed (but found inapplicable) another theory of accrual, the "continuing violation doctrine," which permits a plaintiff to recover for injuries resulting from "a series of small harms, any one of which may not be actionable on its own." (*Aryeh, supra,* 55 Cal.4th at p. 1197.)  "Allegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period."  (*Id.* at p. 1198.)

Appellants do not explain how these theories would apply in the present case except to state that Shell's "misconduct in failing to remediate the property and negligent creation of a continuing nuisance, causing spread of the contamination to the new soil and new construction, is ongoing." The theory appears to be that Shell had an "ongoing" duty to remediate the contamination it caused, so that at least some of this failure to remediate fell within the statute of limitations. In effect, they alleged an omission extending continuously over a period of many years; they have not alleged either a pattern of frequent and similar acts resulting in a series of small harms or a series of separate, recurring breaches of the same duty that could come within the continuous accrual or continuing violation doctrine. Appellants describe their negligence claim as "analogous or perhaps parallel to a continuous nuisance or trespass claim for limitations purposes." At this juncture, we are not called upon to determine whether appellants have a viable cause of action for continuing nuisance based on the continuing effect of Shell's pre-1980 contamination of the site and failure to remediate; summary judgment was granted as to appellants' nuisance claims solely on the basis of section 337.15, which we have held inapplicable. Any claim of negligence causing damage to real property, however, accrued in favor of prior landowners and cannot be pursued by appellants now.[25]

---

[25] Appellants' assertion that the trial court erroneously viewed the complaint as alleging claims of negligent failure to remediate only against defendants other than Shell misreads the trial court's order. As appellants recognize at another point in their opening brief, the trial court acknowledged that the complaint alleged "prior owners of the property contaminated the property and failed to remove the contamination and/or failed to follow the directives and/or orders of the regional water quality control board." The theory the court found the complaint did *not* allege was that appellants' negligence claims against Shell were based on Shell's "failure to adequately perform the duties of a named Responsible Party (including the duty to provide complete information regarding the history of the property), pursuant to the directives of the Water Board." The trial court also commented that this claim based on Shell as Responsible Party "sound[s] in negligent misrepresentation," and that appellants had asserted causes of action for misrepresentation against other parties but not against Shell.

31

We conclude the trial court did not err in finding the causes of action for negligence barred by the statute of limitations.

---

In their briefs on this appeal, appellants describe their complaints as asserting claims that Shell negligently performed its duties as a Responsible Party and failed to perform obligations imposed by the Water Board's directives, and complain that the trial court read the complaint too narrowly in refusing to take this view. Appellants do not, however, directly argue on appeal that their negligence claims can survive the statute of limitations bar on the basis of a negligence-as-Responsible Party theory (which would pertain solely to Shell's conduct after being named a Responsible Party in 2011). Their statute of limitations argument is instead consistently based on Shell's alleged original contamination of the site and failure to remediate in general (e.g., "ongoing, 30-year failure to remediate"), and the trial court's failure to see their claims as asserting new and different injury to property—contamination of the new topsoil and fill and of the condominium structures—from any damage to the land suffered during other owners' tenure.

To the extent appellants imply that the trial court erred in finding they did not allege a theory of negligence based upon Shell's conduct as a Responsible Party, we disagree. As the trial court recognized, the complaint can fairly be read as alleging that Shell contaminated the site through its operations and failed to remediate that contamination, but not as providing notice that Shell's liability was alleged to stem from its current conduct in response to the 2011 order. The complaint refers to failure to comply with directives of the Water Board only in a paragraph of the general allegations describing the deficiencies in the property which begins by enumerating the alleged deficiencies, all but the first of which (contamination of the soil and/or groundwater with harmful petroleum-based chemicals) refer solely to the condominium development with which Shell had no involvement. The next allegations are that "[d]efendants, and each of them, failed to satisfy and/or breached their obligations embodied within the conditions of approval for the project, the covenants running with the land, directives and/or orders from the regional water quality control board, their ongoing obligations to monitor the conditions at the site, failed to clean up the site to the appropriate standards which govern the development of the project . . . ." Read as a whole, these allegations clearly relate to failures to protect against the contamination of the site in constructing the condominium development. While it is possible, through painstaking parsing of the allegations, to identify some that *could* relate to Shell, to do so takes them out of the context in which they appear.

**DISPOSITION**

The trial court properly found the causes of action for negligence barred by the three-year statute of limitations, but erred in finding those causes of action and the causes of action for nuisance barred by the 10-year statute of repose.

Accordingly, summary judgment in favor of Shell is affirmed as to the causes of action for negligence and reversed as to the causes of action for nuisance. The matter is remanded for proceedings consistent with the views expressed herein.[26]

The parties shall bear their own costs on appeal.

---

[26] The trial court denied Shell's argument that the private nuisance claim was barred on a theory of consent by the prior owner of the property and its attempt to limit the damages recoverable on the cause of action for continuing nuisance.

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*The Estuary Owners Association et al. v. Shell Oil Company* (A145516)

34

Filed 7/26/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE ESTUARY OWNERS ASSOCIATION et. al., <br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>SHELL OIL COMPANY,<br><br>　　　Defendant and Respondent. | A145516 <br><br>(Alameda County Super. Ct. Nos. RG10550407, RG10550416, RG12628669) <br><br>**ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION** |

BY THE COURT:

　　　The opinion in the above-entitled matter filed on June 28, 2017, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published in the Official Reports and it is so ordered.

Dated: _____ 　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Kline, P.J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II at pages 24 through 32.

1

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. George Hernandez, Jr. |
| Attorneys for Appellant: | Chapman & Intrieri, LLP<br>John W. Chapman<br>Mark G. Intrieri |
| | Drinker, Biddle & Reath LLP<br>Alan J. Lazarus<br>Jaime D. Walter |
| Attorneys for Respondent: | Caldwell & Proctor<br>Eric S. Pettit<br>Kelly L. Perigoe |
| | Boies, Schiller, Flexner LLP<br>Michael R. Leslie |